STEVEN G. KALAR
Federal Public Defender
Northern District of California
ANGELA CHUANG
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Angela_Chuang@fd.org

Counsel for Defendant Ramos-varela

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JOSE RAMOS-VARELA,<br>Defendant. | **Case No.:** CR 19–713 EMC<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:** Courtroom 5, 17th Floor<br>**Hearing Date:** March 18, 2020<br>**Hearing Time:** 2:30 p.m. |

## INTRODUCTION

Jose Ramos-Varela's entire life has been a struggle. By the age of three, he had effectively lost both of his parents, and later dropped out of the 4th grade so that he could work to help support his remaining family. Mr. Ramos-Varela grew up in Honduras, a country marked by turmoil and unrest that has created an environment in which vast swaths of the country's population—including Mr. Ramos-Varelas' family—live in abject poverty. Basic necessities such as food and clothing were scarce during his childhood, as his grandmother strained to earn enough money to support him and three of his siblings. Now a father himself to two children under the age of 10, Mr. Ramos-Varela's primary objective is to do whatever he can to ensure that his kids do not experience the same deprivations that characterized his own upbringing. He now comes before this Court for sentencing on a single $20 sale of methamphetamine, the result of an exceptionally poor decision but one that ultimately was driven by his underlying desperation to financially provide for his loved ones.

Mr. Ramos-Varela takes responsibility for his actions and understands that he must face consequences for what he has done. He respectfully requests that the Court vary downwards and impose a sentence of time served—effectively two months. Such a sentence is appropriate based on the factors delineated in 18 U.S.C. § 3553(a).

## ARGUMENT

### I. A Sentence Of Time Served Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)

In sentencing Mr. Ramos-Varela, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. §

3553(a)(2). Section 3553(a) also directs the Court to consider a number of additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

Pursuant to the plea agreement in this matter, the parties have agreed to a final offense level of 12. Mr. Ramos-Varela agrees with the Criminal History Category calculation in the modified Pres-Sentence Report ("PSR") placing him in Category I. *See* PSR ¶ 24. The resulting advisory Guidelines range is 10–16 months.

**A. The nature and circumstances of the offense**

Mr. Ramos-Varela was arrested as part of the government's Federal Initiative for the Tenderloin ("FITT") targeting cases arising in the Tenderloin for federal prosecutions, many of which involve relatively minor drug offenses that normally would be prosecuted only at the state level. Along those lines, Mr. Ramos-Varela's conduct in the instant matter consisted of selling $20 worth of methamphetamine to an undercover San Francisco Police Department ("SFPD") officer. When he was arrested, a small quantity of heroin was also found on his person.[1] This offense was a quintessential street-level drug sale that did not involve violence, weapons, possession of large quantities of controlled substances, or other aggravating factors. When placed in perspective, Mr. Ramos-Varela's offense is relatively minor, and accordingly does not warrant additional time in custody beyond that which he has already served.

Mr. Ramos-Varela filed no motions in the case, and took the earliest possible opportunity to plead guilty at his first appearance in District Court. The Court should take into consideration such timely and extraordinary acceptance of responsibility.

---

[1] The plea agreement states that the approximate gross weight of the meth was 4 grams and the approximate gross weight of the heroin was 4.2 grams; both of these values still include the weight of the original packaging. These approximate weights are based on gross weights provided in DEA-7 forms less 28.5 grams per exhibit to account for standard DEA packaging.

**B. The history and characteristics of Mr. Ramos-Varela[2]**

1. Mr. Ramos-Varela's personal background

Mr. Ramos-Varela was born and raised in Cantoral, a town near the Honduran capital of Tegucigalpa. His parents, Carlos Varela and Aida Galvez, were never married but lived together for the first couple years of his life. Tragedy struck when Mr. Ramos-Varela's mother passed away from a lung-related health issue when he was only three years old—merely a toddler. He lost his father as well shortly thereafter, albeit in a different manner. Mr. Ramos-Varela and three siblings were essentially abandoned by their father, who only took his youngest child (Marlon) with him when he left. Carlos went on to start a new life by marrying another woman. Mr. Ramos-Varela's grandmother took on the heavy burden of caring for the other four kids—Melvin, Oneida, Alex, and Mr. Ramos-Varela himself. She was the only parental figure for most of their lives, but she could not find regular employment due to the lack of economic opportunity in the area. She pieced together money from various different jobs, including working in the fields and doing laundry for other families. Despite her best efforts, it was common for the entire family to make do with very little food and no money for other necessities such as clothing or school supplies.

Because of the family's financial struggles, Mr. Ramos-Varela was forced to end his schooling in the 4th grade because he could not afford to keep going to school. His education was so limited that even now, he is only semi-literate in his native language of Spanish. Instead, at the tender age of nine, he began to work in the fields to help support the household. Many of the town's inhabitants rely on manual labor in coffee fields to generate income. Work of this nature is an unskilled, low-paying job that takes great physical toll on those who perform it. Sadly, the coffee industry in Honduras is infamous for its widespread use of child labor, often recruiting children as young as five years old to pick coffee beans. *See* Agence France-Presse, *Honduran Coffee Harvest Relies on Child Workers*, RAW STORY (December 24, 2010)[3]; *see also* 2018 Findings on the Worst Forms of Child Labor:

---

[2] Because of expedited sentencing in this matter, there was no pre-sentence interview. To assist the Court in its determination of an appropriate sentence, undersigned counsel will include in this section information normally obtained in a pre-sentence interview.

[3] Available at https://www.rawstory.com/2010/12/honduran-coffee-child-workers/.

Honduras, U.S. DEPT. OF LABOR, BUREAU OF INT'L LABOR AFFAIRS.[4] Climate change in recent years also has had a catastrophic effect on the coffee industry, meaning that many jobs in the fields have disappeared; this development has sent people north en masse in search of work. *See* Kirk Semple, *Central American Farmers Head to the U.S., Fleeing Climate Change*, N.Y. TIMES (April 13, 2019).[5]

These difficult circumstances, as well as the great pressure Mr. Ramos-Varela felt to help earn money, drove him to come to the United States around 2007 in search of work. He spent the next two years in Atlanta working as a roofer. It is in Atlanta that he sustained his first and only prior conviction for cocaine possession.[6] His sentence on that case was straight probation with no jail time whatsoever, and he was then deported back to Honduras. In the years since, his loved ones' financial situation has become ever more demanding and precarious. About eight years ago, his grandmother—the woman who had raised him—was diagnosed with chronic heart disease, the treatment of which requires a regular supply of expensive medications. Around the same time, Mr. Ramos-Varela became a father for the first time with his common-law wife, Emily Yolibeth Garcia. Their second child was born just over two years ago. This year marks his 11th year with his wife as a couple. He moved with his expanding family to his wife's hometown of Monte Redondo (also in the vicinity of Tegucigalpa) around 2016; his wife and children still reside there, while his siblings and grandmother remain in Cantoral.

When Mr. Ramos-Varela reflects on his childhood, he remembers being hungry all the time, a feeling that he will never forget. He does not want his children to grow up the same way he did, scrambling constantly to meet their most basic needs and going to work before they hit puberty. Because of that desire and the fact that he has never served any type of jail sentence before, the time that he has spent in custody while the instant matter has been pending has affected him drastically. Mr. Ramos-Varela understands that in the future, he must work to support his family from Honduras and not from the United States, or else he will face new criminal charges and likely increasingly

---

[4] Available at https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2018/Honduras.pdf.
[5] Available at https://www.nytimes.com/2019/04/13/world/americas/coffee-climate-change-migration.html.
[6] The sentence on this conviction was imposed over ten years prior to the commission of the instant offense, and results in zero criminal history points.

severe sentences. Every day that he spends in jail is another day that he is unable to work and earn money for his family; additional time in custody not only would be overly punitive for Mr. Ramos-Varela as an individual, but would unfairly punish his family as well, including his two-year-old baby.

2. Immigration consequences for Mr. Ramos-Varela

It is almost certain that Mr. Ramos-Varela will be deported following resolution of the instant matter. He also will be permanently inadmissible to the United States, meaning that he will be barred from re-entry for the rest of his life. Before deportation, he will spend an uncertain period of time in immigration detention—a time period that could easily stretch to a month or more—which will serve as an additional custodial consequence of his conduct.[7]

3. Conditions in Honduras

As set forth above, Mr. Ramos-Varela came to the United States from Honduras because there was no realistic opportunity of gainful employment there, which can be attributed in large part to the violence that pervades the country. Although this fact does not excuse Mr. Ramos-Varela's criminal conduct, it does provide an important perspective, especially when considering the role in creating those violent conditions in Honduras played by the same federal government prosecuting him here.

Honduras is a dangerous and violent country with one of the highest murder rates in the world. *See* Honduras 2018 Crime & Safety Report, OVERSEAS SECURITY ADVISORY COUNCIL [hereinafter 2018 Crime & Safety Report][8]; *see also* Gangs in Honduras, INSIGHT CRIME [hereinafter Gangs in Honduras] at 1 ("In 2014, Honduras was considered the most violent nation in the world that was not at war.").[9] Tegucigalpa, the capital of Honduras, and San Pedro Sula, the country's economic center, are two of the ten most dangerous cities in the world.[10] Central America Refugee Crisis, U.N. REFUGEE AGENCY[11]; *see also* Gangs in Honduras at 1. According to the 2018 State Department Human Rights Report, violence in Honduras includes "homicide, extortion, kidnapping, torture,

---

[7] As noted in the PSR, an ICE detainer has already been lodged against Mr. Ramos-Varela. PSR ¶ 5.
[8] Available at https://www.osac.gov/Content/Report/84d448fd-c42b-462c-91ce-15f4ae5df483.
[9] Available at https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf.
[10] Mr. Ramos-Varela's hometown is within 50 miles of Tegucigalpa.
[11] Available at https://www.unrefugees.org/emergencies/central-america/.

human trafficking, intimidation, and other threats . . . ." Country Report of Human Rights Practices for 2018, Honduras, U.S. DEPT. OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR at 1.[12]

Although there are many reasons for the high crime and murder rates, political instability and gang activity have contributed to the violence for decades. In the 1980's, the United States used Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.* Neighboring countries Guatemala and El Salvador, also endured internal wars that left the countries unstable. *Id.* Because many were left unemployed and weapons were readily available, criminal groups began to form throughout Central America. *Id.* According to the Wilson Center, crime generally goes unreported because of corruption, weak law enforcement, and active criminal groups. *See* Cristina Eguizábal et al., Crime and Violence in Central America's Northern Triangle, WILSON CTR RPT. ON AMERICAS [hereinafter Crime and Violence] at 1–2.[13] In 2009, a military coup ousted Honduras President Zelaya making Honduras the first Central American country to undergo a coup in nearly two decades, and in 2017, the most recent Honduran presidential election came under question as many organizations noticed irregularities with the results. *See* Central America's Violent Northern Triangle; *see also* Honduras: Guarantee Credibility of Elections, Protect Free Expression, HUMAN RIGHTS WATCH (Dec. 2017).[14] Because of the instability and unrest within Honduras, the United States has issued warnings cautioning travel there since 2012. *See* 2018 Crime & Safety Report. These travel warnings are indicative of the safety concerns in the country and demonstrate why many are fleeing in hopes of creating more sustainable lives.

**C. The need to avoid unwarranted sentencing disparities**

A time-served sentence—effectively two months—would avoid unwarranted disparities with defendants in strikingly similar cases arising from the FITT. This becomes especially apparent when

---

[12] Available at https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/honduras/.

[13] Available at https://www.wilsoncenter.org/sites/default/files/media/documents/publication/FINAL%20PDF_CARSI%20REPORT.pdf.

[14] Available at https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-protect-free-expression.

one looks at the circumstances of cases ending in a time-served sentence where the facts of the offenses were more serious and/or the defendants had a more extensive criminal history than in the instant matter. The following cases are illustrative:

- *United States v. Jesus Flores*, CR 19-429 SI. Mr. Flores was arrested for a $15 drug sale. Officers found $932 cash and multiple other drugs on him, including 56 grams of cocaine base, 38.2 grams of heroin, 32.5 grams of methamphetamine, and 31.1. grams of marijuana (gross weights). He had also been deported two times in the past. Mr. Flores' Guidelines calculation was identical to that in the instant matter (10–16 months based on an offense level of 12 and a Criminal History Category of I). Judge Illston sentenced him to time served (effectively four months).
- *United States v. Wilfredo Cabrerra*, CR 19-452 WHO. Mr. Cabrerra was convicted of a $17 heroin sale. His Guidelines range was 8–14 months. Mr. Cabrerra's record was far more serious than Mr. Ramos-Varela's, as it included three prior convictions for drug sales—including one that resulted in a four-year prison sentence—and six deportations. Judge Orrick sentenced him to time served (effectively four months).
- *United States v. Pedro Anibal Anariba Muncia*, CR 19-428 CRB. Mr. Muncia was arrested for a $20 heroin sale. The officers recovered $996 and multiple other drugs, including 37.3 grams of heroin, 35.3 grams of cocaine base, and 33.1 grams of methamphetamine (gross weights). His record included a prior federal conviction for distribution of controlled substances that had resulted in a sentence of 180 days in custody, after which he was deported. Following the government and defendant's recommendation, Judge Breyer sentenced him to time served (effectively four months).
- *United States v. Brayan Arteaga*, CR 19-426 WHO. Mr. Arteaga was convicted of a $16 crack cocaine sale. He was on probation at the time of the offense, and faced a Guidelines range of 8–14 months based on an offense level of 10 and a Criminal History Category of II. Judge Orrick sentenced him to time served (effectively one month).

**CONCLUSION**

For all the reasons set forth above, Mr. Ramos-Varela respectfully requests that the Court impose a sentence of time served. He does not have any financial assets and therefore is requesting that any fine be waived. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

Dated: March 11, 2020

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

/S
ANGELA CHUANG
Assistant Federal Public Defender